IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 25, 2001 Session

## TIMOTHY JOE ELLINGTON v. LINDA MADDOX, ET AL.

**A Direct Appeal from the Juvenile Court for Haywood County**
**No. 5644     The Honorable J. Roland Reid, Judge**

---

**No. W2000-00948-COA-R3-CV - Filed March 12, 2001**

---

Natural father filed a petition to obtain custody of his son against the maternal grandmother and her husband, the child's custodians by previous court order. After an evidentiary hearing, the juvenile court denied father's petition and retained custody in the maternal grandmother and husband. Father appeals, and we reverse.

**Tenn.R.App.P. 3; Appeal as of Right; Judgment of the Juvenile Court Vacated and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY KIRBY LILLARD, J., joined.

C. Timothy Crocker, Milan, For Appellant, Timothy Joe Ellington

Larry S. Banks, Brownsville, For Appellees, Linda Maddox, Rickey Maddox, and Kimberly Dawn Rosson

**OPINION**

Petitioner, Timothy Joe Ellington (Father), appeals the order of the juvenile court denying his petition to change custody of his minor son, Conner Ellington, against respondents, Linda Maddox and Rickey Maddox (Maddoxes), the child's natural grandmother and step-grandfather, respectively. We vacate the decision of the Haywood County Juvenile Court denying Father custody, because the evidence does not support a finding that the award of custody to the natural father would subject the child to a substantial threat of harm.

The child was born out of wedlock on September 24, 1993. The mother, Kimberly Dawn Haywood, now Rosson, filed a petition to establish paternity on September 22, 1994, naming Timothy Joe Ellington as father of the child. On November 2, 1994, an order was entered declaring Mr. Ellington the natural father and ordering him to pay child support.

For most of the child's life, he has resided in the home of his maternal grand-mother, Linda Maddox and step grand-father, Rickey Maddox. On September 22, 1994, while the paternity action was pending and prior to the court order establishing paternity, the Maddoxes filed a petition for temporary custody alleging that the mother, who lived with them at the time, was unable to properly care for the child and regularly left him unprovided for and unattended. No action was taken on this petition. On April 18, 1995, after the order of paternity was entered, they filed another petition requesting temporary custody and that they receive Father's child support payments ordered to be paid to the mother. The mother joined in this petition. On June 15, 1995, Father filed a petition seeking custody of the child. At the hearing on these petitions, the Maddoxes withdrew their petition by oral motion. By order entered in January 16, 1996, the mother retained custody, and Father was allowed liberal visitation. On September 11, 1997, the Maddoxes filed a petition for emergency temporary custody of the child, alleging that the child was dependent and neglected, and in imminent danger if he continues to reside with the mother. Temporary custody was awarded to the Maddoxes on September 11, 1997. On October 30, 1997, an order was entered granting custody to the Maddoxes because of the mother's violation of a previous order.

On April 13, 1998, the mother filed a petition for change of a custody against the Maddoxes alleging a substantial change in circumstances. On May 8, 1998, Father filed an answer and cross-claim admitting that there had been a substantial change in circumstances and that a parent should be awarded custody. The cross-claim averred that no allegations or findings have been made that he was an unfit parent, or that he had contributed to the conditions giving rise to the child's removal from the custody of the mother. Father further averred that he has paid required child support and has developed a substantial relationship with his son. Father sought custody of the child in the event that it was not restored to the mother. Apparently, no action was taken on these petitions.

On August 20, 1999, the mother filed another petition for the change of custody, again alleging that there had been a substantial change in circumstances. The mother averred that she had married Mr. Rosson, and lived with him and her three other children[1] in a stable and loving home environment. She alleges that the Maddoxes had interfered with her visitation rights. On September 7, 1999, Father filed a petition seeking custody of the child alleging that he had married in July of 1999, and that he and his wife have a house, are employed, and are able to maintain a safe and loving home for the child. The Maddoxes answered Father's petition and filed a cross-petition against him. They alleged that exposing the child to Father's attitude and living conditions, including the use of alcohol and foul language, were not in the best interest of the child, and that the conditions in Father's home would probably subject the child to further abuse or neglect. Most of the allegations contained in the Maddoxes cross-claim were later voluntarily dismissed without prejudice. On October 21, 1999, a consent order was entered, limiting Father's visitation to supervised visitation by his mother, Linda Hallibrook. On October 26, 1999, the Maddoxes filed an answer to the mother's petitions for a change of custody and sought to terminate her parental rights averring that the child had reported sexual abuse by the mother's husband, the child's step-father.

---

[1]  At trial the mother testified to having two other children.

An evidentiary hearing was held on December 10, 1999. The mother appeared and voluntarily dismissed her petition. Father's proof included his testimony as to his relationship with his son, his prompt payment of child support, his stable home environment, and his desire and ability to have custody of his son. Father denied ever having discussed the sexual abuse allegations with the child. Susan Hamm, employee of the Department of Children's Services, testified that she had visited in Father's home and found that it would be a safe place for the child to live. Linda Hallibrook, Father's mother, testified to the ongoing relationship between the child and Father, and Father's care for the child throughout the child's life. Father's wife, Christie Ellington, testified to the appropriateness of their home for the child and the child's relationship with her eight year old daughter, who also lived in the Ellingtons' home. Ms. Ellington further testified to Father's close relationship with the child, and their desire and ability to have custody. Ms. Ellington denied any conversation with the child regarding the sexual abuse allegations, and stated that profanity was not used in the child's presence as a rule. She admitted to having marital disagreements with Father, and stated that the child could have overheard them. Finally, Ms. Ellington stated that she and Father occasionally drink alcoholic beverages in the presence of the child.

The Maddoxes then presented their proof including the testimony of the mother, Kimberly Rosson, who stated that she is currently married, but separated, and has two children other than Conner. Ms. Rosson stated that she had separated from Mr. Rosson due to allegations of his sexual abuse of Conner. The mother agreed that she had sought to regain the custody of the child in the past, but no longer wants to remove him from the custody of her parents, because she believes that it would be selfish of her as the child is happy and well cared for. Ms. Rosson also testified to the child's use of profanity in the past upon returning from visitation with his father, and stated that it would be in the child's best interests to stay with her parents. Next, Joyce Brummit, a close friend of Linda Maddox, testified that she transported the child to school every morning and that he was a happy, well-adjusted boy. Ms. Brummit testified that the Maddoxes provide a good home for the child. She stated that on occasion she has witnessed the child's upset at having to go with his father. Ms. Brummit stated that a change in custody would devastate the child as the Maddoxes' home is the only home he has known.

Next to testify was Renae Pullen, an employee with the Department of Children's Services, who interviewed the child one time. Ms. Pullen testified to referring the child to counseling, and stated that the investigation into the allegations of child abuse is ongoing. Ms. Pullen recommended that the child remain with the Maddoxes, however admitted that her knowledge of the father was "nonexistent." Rickey Maddox, the child's step-grandfather, then testified to the clean conditions in the Maddoxes' home and the child's resistence to visitation with his father. Kathy Barnes, a licensed clinical social worker, testified that during her previous employment with Professional Counseling Services, the child was referred to her by the Department of Human Services for counseling following the alleged sexual abuse. Ms. Barnes testified to having eleven visits with the child, and stated that he was very concerned about the well being of his grandmother. Over the objection of Father's attorney, Ms. Barnes testified to what the child told her concerning statements that Father had made to the child regarding the alleged sexual abuse. She believed Father's statements hindered the child's progress in counseling, and that it was in the child's best interests

to stay in the Maddoxes' home because a change in custody would create a substantial harm to the child. Linda Maddox then testified regarding the continued care that she has given to the child, the child's attendance at a Christian school in Jackson, and the stability of her home. Ms. Maddox further testified that Father's visitations have had a negative effect on the child, and that she was concerned for the child in the event of a change of custody to Father.

After the submission of post-trial briefs by the parties, the trial court entered an order on January 5, 2000, denying Father's petition for a change of custody, which states in pertinent part:

> The Court is convinced by the evidence presented that a change in custody at this time would subject the child to a risk of substantial harm. With the emotional state of the child as it is having to deal with the sex abuse issues and a danger of the investigation being compromised a change of custody would be inappropriate.

Father appeals, raising two issues as stated in his brief:

> I. Whether the Trial Court erred by ruling that the Appellees satisfied their burden to make a clear showing that an immediate award of custody of the involved child to the Appellant would create a risk of serious or substantial harm to the child.?
>
> II. Whether the Trial Court made evidential rulings that would amount to reversible error.

We will consider Issue II first. These issues relate to the testimony of Kathy Lynn Barnes, a witness for the Maddoxes. Ms. Barnes testified that she is a licensed clinical social worker. Conner was referred to her by the Department of Children's Services concerning the report of sexual abuse by his stepfather. During the course of her testimony relating her interviews with Conner, she stated that Conner told her that Father ridiculed him by calling him a liar and a freak. Her notes of this interview, which contained this statement by Conner, were introduced as an exhibit to her testimony. Also introduced as an exhibit to her testimony was a letter that she had written to the Maddoxes' attorney at his request which contained the same information concerning Conner's statement. Father's lawyer objected to the introduction of the evidence on three occasions on the ground of hearsay, and the trial court overruled the objections.

The Maddoxes first assert that the child's statement to Ms. Barnes is not hearsay, because they argue it was not offered to prove the truth of the matter therein asserted. They contend that it was not offered to prove that the child was a liar or freak. We can certainly agree on that contention; but, they miss the point. The evidence was offered to prove that Father **called** his son a liar and a

freak. The crucial question was did Father say these things, and, obviously, the evidence as offered was hearsay.

Alternatively, the Maddoxes assert that the trial court properly admitted the evidence pursuant to Tenn.R.Evid. 803(6) which provides:

> (6) Records of Regularly Conducted Activity. - A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used on this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

The Advisory Commission Comment states:

> [T]he proposal specifically requires that the declarant have "a business duty to record or transmit" information. Without that duty, a business record would lack the trustworthiness necessary to carve out a hearsay exception.

The record in the present case fails to indicate a business duty on the part of this counselor to record or transmit the record. The testimony indicates that these are notes she makes concerning the interview for her own personal records. In any event, if the record is properly admitted into evidence, the complained of statement therein constitutes hearsay on hearsay or a second-level hearsay statement.

In *Butler v. Ballard*, 696 S.W.2d 533 (Tenn. Ct. App. 1985), this Court had before it a personal injury case wherein the plaintiff made objection to hearsay to certain portions of his hospital record which the defendant admitted into evidence. The opinion states:

> Plaintiff, in his testimony, denied the use of either drugs or alcohol on the day of the accident. At the time plaintiff was admitted to Eastwood Hospital, an employee of the hospital included as part of plaintiff's admitting history a statement taken from a person or persons unknown, that on that day plaintiff had ingested a half of a pint of scotch and had smoked marijuana. There was a second

reference to this statement from an unknown source in plaintiff's hospital records in a nurse's admission/discharge assessment. Notwithstanding plaintiff's objections, the trial court admitted the hospital records of plaintiff, including the statement concerning the ingestion of alcohol and drugs, as substantive evidence without qualification or limitation.

*Id.* at 535. The trial court admitted the hospital record without qualifying instructions for the jury. This Court, in ruling on the trial court's action, stated:

> While the Business Records As Evidence Act is a broad exception to the hearsay rule, it should not be considered a vehicle by which any and every statement recorded in a business record may qualify as admissible evidence. A limitation on this hearsay exception was aptly described by the Connecticut Supreme Court in *Kelly v. Sheehan*, 158 Conn. 281, 259 A.2d 605 (1969): "the mere fact that a record is generally admissible under § 52-180 [Connecticut's Business Records As Evidence Act] 'does not mean that anything and everything contained in the record is necessarily admissible in any given case.'" *Id.* 259 A.2d at 607. Our Supreme Court in *Graham* likewise recognized that other rules of evidence come into play when considering the business records exception. The Court stated:

> > Thus it is that the admissibility of records made during the course of business is the general rule and their introduction is not subject to a blanket objection on the basis of hearsay. This does not mean, however, that other recognized rules of evidence may not preclude their introduction in whole, or in part.

> 547 S.W.2d at 538.

*Id.* at 536.

In holding that the statement in the hospital record was not admissible, the Court said:

> For the second-level hearsay statements of the unidentified informant to be admissible, they would either have to fall within a hearsay exception, in which case they could be considered to be admitted as substantive evidence, or they would have to be relevant to the treatment and diagnosis of the plaintiff by the testifying physician and

thus so admitted, but with limiting instructions from the court to the effect that they could not be considered for the truth of the matter therein asserted.

*Id.* at 539.

The trial judge ruled on the admissibility of the evidence primarily on the basis of the Business Records Act. He also commented that the evidence was admissible under the state of mind exclusion of the hearsay rule. Tenn.R.Evid. 803(3). It is conceivable that the child's statement could be a reflection upon his state of mind regarding Father's conduct. This is a very close question, but in view of the trial court's wide discretion and the admissibility of evidence, we find that the trial court did not err in the admission of the evidence on that basis. If this were a jury trial, the trial court's admission of the evidence would necessitate a limiting instruction to the jury to the effect that the matter could not be considered for the truth of the matter therein asserted, and we assume the trial judge considered the evidence in that light.

Father's first issue raises the question of whether the trial court erred in finding that the Maddoxes met their burden to make a clear showing that an immediate award of custody of the child to Father would create a risk of serious or substantial harm to the child.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

Tennessee law protects a natural parent's constitutional right to the care and custody of their children recognizing that "the right of a parent is superior in a custody dispute between a parent and a third party." ***Doles v. Doles,*** 848 S.W.2d 656, 660 (Tenn.Ct. App. 1992) In a contest between a parent and a non-parent, the parent can not be deprived of the custody of his child unless there is a finding that substantial harm threatens the welfare of the child if the parent is awarded custody. ***In re Askew***, 993 S.W.2d 1, 4 (Tenn. 1999) *; and In re Adoption of Female Child (Bond v. McKenzie),* 896, S.W.2d 546, 548 (Tenn. 1995). A finding of a substantial threat of harm to the child's welfare may include a finding that the parents are unfit or that the child is dependent and neglected. *Askew*, 993 S.W.2d at 4. After such a finding is made, the court may then view the question of custody by determining the best interest of the child. *Askew*, 993 S.W.2d at 4.

We believe that the holding of our Supreme Court in ***In Re Askew*** is controlling in this case. In ***In re Askew***, the Court held that without a valid determination that a parent was unfit, or that parent's custody would result in "substantial harm" to the child, deprivation of the parent's custody of the child would be a violation of the parent's "constitutional right to rear and have custody of his or her child." *Id.* at 4. In finding that there had been no valid initial determination of "substantial harm" to the child, the Supreme Court reversed the lower courts in awarding custody of the child to a family friend who had physical custody of the child at the time of trial.

In the instant case, there was no prior determination that Father was an unfit parent or that his custody of the child would result in substantial harm to the child's welfare. The burden in this case is on the Maddoxes to prove that Father's custody would create a risk of serious harm to the child. The trial court recognized the controlling law, although the Maddoxes argued that Father was required to show a material change in circumstances in order to reach the question of substantial harm to the child. The record reflects that the trial court applied the correct standard including that "only after finding a parent unfit or where a risk of substantial harm threatens that child's welfare may a court consider the best interest of the child." Therefore, the question before the Court is whether the evidence preponderates against the trial court's finding that "a change in custody at this time would subject the child a risk of substantial harm." The order reflects that the trial court based this determination on: "With the emotional state of the child as it is having to deal with the sex abuse issues and a danger of the investigation being compromised, a change of custody would be inappropriate." We must respectfully disagree with the trial court. We cannot find that this would result in substantial harm to the child. Moreover, we note that, although the juvenile court considered the evidence concerning Father's alleged statement about the child being a liar and a freak, this, in itself, does not appear to this Court to be sufficient to show a substantial harm to the child's welfare. Simply stated, there is not any evidence in the record that indicates that Father is unfit or that a grant of custody to Father would result in substantial harm to the child. The record indicates an opinion by one of the social workers that custody awarded to Father would result in substantial harm to the child, but this is a conclusory statement without any underlying facts to support it or to bolster it in any manner.

Under these circumstances, we find that the evidence preponderates against the trial court's finding that an award of custody to Father would result in substantial harm to the child. Accordingly, the order of the trial court is vacated, and custody of the child is awarded to Father.

In a previous case, *In Re Kayla D. Crawford*, No. 02A01-9405-CH-00124, 1995 WL 72615 (Tenn. Ct. App. W.S. Feb. 22, 1995), this Court dealt with a custody contest between the natural father of the child and his brother and sister-in-law. In vacating the order of the trial court granting custody to the father, this Court said:

> Moreover, it does appear that the chancellor gave much weight to the fact that the child had been with the aunt and uncle for a long period of time, while at the same time evidencing confidence in respondent's responsibility by awarding weekend visitation. We have no doubt that the aunt and uncle are kind, caring and loving and have been good custodians for Kayla. The fact remains, however, that they are not the natural parents. Undoubtedly, the policy of the law favors a natural parent and every effort should be made to put stability in the child's life with its natural parents. The parenthood bond should be nurtured in every way possible, because it is by far one of the strongest bonds known to humankind. By the same token, Kayla deserves the love and affection derived from loving grandparents,

> aunts and uncles.  Every effort should be made by Kayla's entire
> family that she not be deprived of all of the love and care available to
> her.  The extended family is by far a blessing which cannot be
> duplicated.

*Id.* At *6.  The statements of the Court in *Crawford* apply equally to the case before us, and we strongly recommend to Father that he work with the extended family of this child to give this child every advantage available.

The order of the juvenile court is vacated, custody is awarded to Father, and the case is remanded to the juvenile court for such further proceedings as may be necessary.  Costs of the appeal are assessed against the appellees, Linda Maddox and Rickey Maddox.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.